NATIONAL SURETY CORPORATION, a corporation of the State of New York, Appellant,

v.

The MIDLAND BANK, a corporation of New Jersey, Appellee.

No. 76–1686.

United States Court of Appeals, Third Circuit.

Argued Jan. 14, 1977.

Decided Feb. 25, 1977.

---

Lum, Biunno & Tompkins, Newark, N.J., for appellant; David A. Birch, Charles H. Hoens, Jr., Newark, N.J., on the brief.

Milton, Keane & Brady, Jersey City, N.J., for appellee; Thomas J. Brady, Jersey City, N.J., on the brief.

Shearman & Sterling, New York City, for American Ins. Ass'n as amicus curiae; Henry Harfield, New York City, of counsel.

Sullivan & Cromwell, New York City, for N.Y. Clearing House Ass'n as amicus curiae; William E. Willis, Hamilton F. Potter, Jr., H. Rodgin Cohen, New York City, of counsel.

Before GIBBONS and GARTH, Circuit Judges, and BECHTLE,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This diversity suit resulted from defendant Midland Bank & Trust Company's (Bank's) refusal to honor drafts submitted by plaintiff National Surety Corporation pursuant to so-called "standby" letters of credit issued by the Bank. The Bank justi-

---

* Louis C. Bechtle, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

fied its refusal to honor the drafts by claiming that the letters of credit were invalid, asserting that New Jersey law prohibited banks from issuing such standby letters of credit if they exceeded one year in duration.

The district court sustained the Bank's contention, 408 F.Supp. 684 (D.N.J.1976), and held the letters of credit invalid. We reverse.

## I.

On January 9, 1967, the Bank issued Irrevocable Letter of Credit No. 1549 in favor of National Surety. This letter of credit had issued at the behest of Astrorico Compania Naviera, S.A., which required collateral security to secure a release of libel bond which National Surety had executed for one of Astrorico's vessels. In its letter of credit, the Bank authorized National Surety

> to draw on us at sight up to an aggregate amount of $10,250 available by your drafts at sight accompanied by your written certification that you have incurred liability, loss, costs or expense by reason of your having executed Bond of Indemnity or undertaking on behalf of Astrorico Compania Naviera, S.A.

As to duration, the bank's letter stated:

> It is a condition of this letter of credit that it shall be deemed automatically extended without amendment for one year from the present or any future expiration date hereof, unless thirty days prior to any such date we shall notify you by registered letter that we elect not to con-

sider this letter of credit renewed for any such additional period.[1]

As the district court noted,[2] the parties had thus executed a "standby" letter of credit. The undisputed facts underlying this dispute may be simply stated. The shipping company's vessel had been seized by United States Marshals pursuant to unrelated litigation. To obtain a release from such seizure, the shipping company required a "release of libel" bond, which it sought from National Surety. National Surety refused to post surety in the absence of collateral. To obtain collateral for the issuance of National Surety's bond, the shipping company arranged with the Bank to issue Irrevocable Letter of Credit No. 1549, described above, with National Surety named as beneficiary. Upon the execution of the Letter of Credit securing National Surety, National Surety issued its bond, and the vessel was released.

The Bank's conditional extension of credit was called into play by Astrorico's failure to satisfy a judgment rendered against it. As surety on the release of libel bond, National Surety became obligated to pay over the sum of $7,878.00, the aggregate of the judgment, interest and costs. National Surety tendered payment of this amount, and it then forwarded a sight draft, together with the required documents certifying loss, to the Bank. The Bank refused to honor the sight draft.[3]

Meanwhile, on February 1, 1967, the Bank had issued its Irrevocable Letter of Credit No. 1553.[4] National Surety was

---

1. The district court's opinion sets out the Letter in its entirety. 408 F.Supp. at 694.

2. Id. at 687, 692–93.

3. The bank's letter of rejection reads as follows:

> . . . Re: Irrevocable Letter of Credit
> # 1549—Astrorico Compania
> Naviera, S.A.

> We are rejecting herewith your sight draft and are returning attached hereto, the sight draft presented to us for payment together with a Letter of Credit, # 1549, dated January 9, 1967 in the amount of $7,878.00, running to the National Surety Corporation.

> This request for payment is being rejected for many reasons and among the reasons are the following:
> (a) Issued without proper authorization
> (b) Presentation for payment, even if it were properly issued, is not timely
> (c) It is our opinion that the Letter of Credit at this particular date constitutes an illegal and valueless document.
> I am sure that you will understand our reasons for not honoring payment.

App. at A–59. This letter bore the signature of the bank's president.

4. The underlying arrangements pertaining to Letter of Credit No. 1553 were identical (except

again authorized to draw upon the Bank by sight draft (this time, to an amount not to exceed $50,000), although its release of libel bond was executed in this instance on behalf of Asopos Shipping Company, S.A. Like Letter of Credit No. 1549, Letter of Credit No. 1553 was to remain in effect for one year, subject to automatic renewal without amendment, unless, at least 30 days before expiration the Bank notified National Surety that the Letter of Credit would not be renewed. Upon receipt of notice of non-renewal, National Surety was authorized to submit sight drafts to the amount of the release of libel bond, $50,000. The only proof required in such a case would be National Surety's certification that its release of libel bond was still outstanding.

On June 25, 1971, the Bank, through its counsel, repudiated Letter of Credit No. 1553.[5] National Surety treated the Bank's disavowal as an exercise of the Bank's option not to renew. Pursuant to its authorization under the Letter of Credit, National Surety on December 13, 1971 submitted a sight draft for the full amount of its outstanding release of Libel bond—$50,000.[6] The Bank refused to honor this draft.

National Surety then initiated this action in the United States District Court for the District of New Jersey. Its complaint initially sought (1) a declaration of the rights and duties of the parties under Letter of Credit No. 1553, and a declaration that this Letter was valid and binding upon the Bank, and (2) judgment against the Bank for $50,000 under the Letter's terms. A third count, added by supplemental complaint and involving Letter of Credit No. 1549, alleged that National Surety had satisfied a judgment against Astrorico, that it had submitted a draft for the amount paid ($7,878.00) under Letter of Credit No. 1549 and that the Bank had refused to honor this demand. National Surety under this count sought compensatory and punitive damages for this alleged breach of the Bank's obligations under Letter of Credit No. 1549.

The Bank asserted the same defenses to both the complaint and supplemental complaint. Its first defense was that the respective Letters of Credit were "illegal and void at [their] inception;" its second defense, that the respective Letters of Credit had expired prior to the drawing of the drafts in question; and its third defense, that the Letters of Credit were issued without authority.[7] National Surety served interrogatories upon the Bank, and the Bank's answer focused the dispute between the parties:

> Answer: Midland Bank Letter[s] of Credit . . . [were, by their] terms, drawn to be automatically extended indefinitely in time and N.J.S.A. 17:9A–25(3) limits Letters of Credit to a one year term.[8]

With these submissions before the district court, both parties moved for summary judgment. After hearing argument, on

---

for amount and date) to those described in text in connection with Letter of Credit No. 1549.

5. Counsel's letter of disavowal reads in pertinent part:

. . . Re: Midland Bank and Trust Company Letter of Credit #1553 to National Surety Corporation, dated February 1, 1971.

---

With regard to the above captioned letter of credit, please be advised that the Midland Bank and Trust Company can accept no obligation under it because among other reasons it is illegal and void pursuant to N.J.S. 17:9A–25(3) and because it was issued without authority.

Please be further advised that the Midland Bank and Trust Company can accept no obligation because of any action you may take in the situation which was the occasion of this letter of credit.
App. at A–62.

6. The anniversary date of Letter of Credit No. 1553 was February 1. It had last been renewed on February 1, 1971. National Surety ultimately paid out the sum of $27,500.00 under its release of libel bond. Record of October 7, 1974, at 18–19.

7. See Defendant's Answer, App. at A–14; Defendant's Answer to Supplemental Complaint, App. at A–23 to A–24.

8. App. at A–25, A–26. N.J.S.A. 17:9A–25(3) is set out at p. 26 infra.

May 28, 1974, the court denied both motions, as it found that the motions revealed "genuine issues of material fact."[9]

Thereafter, on October 7, 1974, the case was tried. National Surety established that judgment had been entered against Astrorico, the principal on its release of libel bond; that National Surety had presented a sight draft to the Bank with certification of loss pursuant to Letter of Credit No. 1549; and that this draft had been dishonored.

Through its single witness,[10] National Surety also established that the Bank's counsel had advised by letter that any drafts drawn on Letter of Credit No. 1553 would not be honored, and that National Surety had responded to this communication by immediately submitting a sight draft for $50,000, as it was empowered to do upon notice of nonrenewal. (*See* pp. 23–24 *supra.*)

The Bank called but one witness—Thomas Stagnitti, its president and chief executive officer. His testimony bulwarked the Bank's contention that the Letters of Credit were void and unenforceable. His interpretation of the applicable banking law in New Jersey was that New Jersey state banks were denied the power to issue letters of credit exceeding one year's duration. He testified regarding State Department of Banking Examiners' reports which indicated that the New Jersey Department of Banking considered letters of credit with automatic renewal provisions (such as contained in Nos. 1549 and 1553) to violate the statute. *See* Finding of Fact # 13, 408 F.Supp. at 695.

The conclusion of the one-day trial did not signal an end to the court's quest for information concerning interpretation of New Jersey banking law. New Jersey's Deputy Commissioner of Banking, writing in response to an apparent *sua sponte* inquiry by the district court, gave his opinion that the Banking Department would read the relevant New Jersey statute as barring letters of credit, as well as drafts drawn upon such letters of credit, if either exceeded one year in duration.[11]

On February 17, 1976 the district court filed its opinion which included its findings of fact and conclusions of law. The court held

> that [N.J.S.A. 17:9A–25(3), containing the one-year limitation,] does not authorize issuance of an irrevocable letter of credit valid for more than a year from the date of its issuance, and that this matter raised in defense is sufficient to defeat the surety company's claim as beneficiary under the letters.

408 F.Supp. at 686. On March 23, 1976 judgment was entered in favor of the defendant on all claims. This appeal followed.[12]

9. Order of August 6, 1974, App. at A–28.

10. Albert Mayell, an employee of National Surety's parent corporation, testified as to the circumstances of these Letters of Credit and the customs and practice of the industry.

11. The district court set out the relevant portion of the Deputy Commissioner's letter as follows:

> While the Department of Banking has not issued any administrative interpretations of the section in question, it has long been the Department's position that the words 'not exceeding one year' applies to the whole subsection, including letters of credit. A prudent banker would not issue a letter of credit without a maturity or termination date. It would not be sound banking to allow a contingent liability to possibly exist forever. You will note in subsection 2 .of section 25 that banks have the power 'to accept for future payment at future dates drafts drawn upon it by its customers' without a maturity limitation placed upon those drafts. Why, therefore, should drafts drawn upon letters of credit have a maturity when the letter of credit itself has no maturity? You might also refer to the Comptroller of the Currency's interpretive ruling [12 C.F.R. §] 7.7016 with respect to letters of credit. You will note the Comptroller rules that letters of credit must be written with a maturity date.

408 F.Supp. at 691 n.12.

12. On August 25, 1976 an order was entered by this Court permitting American Insurance Association to file an *amicus* brief. On September 8, 1976 the New York Clearinghouse Association was granted leave to file its brief as *amicus curiae.* Both *amici* support National Surety's position before us and consequently urge us to reverse the order of the district court.

■ While not taking issue with the district court's findings of fact, National Surety does dispute the district court's conclusion that New Jersey's banking laws render nugatory letters of credit effective for more than one year.[13] Notwithstanding the district court's analysis, we are left unpersuaded that New Jersey requires the result reached by the district court. Indeed, under our analysis a different conclusion is required. We conclude that the statute in question, N.J.S.A. 17:9A–25(3), imposes its one-year limitation not on letters of credit, but only on drafts which are drawn upon letters of credit. This conclusion results in our upholding the validity of these Letters of Credit, and mandates that we reverse the district court judgment.

## II.

Under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 we must ascertain and apply New Jersey law in this diversity case. The relevant statutory law here is found in N.J.S.A. 17:9A–25:

> In addition to the powers specified in section 24, every bank shall, subject to the provisions of this act, have the following powers, whether or not such powers are specially set forth in its certificate of incorporation:
>
> \*  \*  \*  \*  \*  \*
>
> (3) to issue letters of credit authorizing holders thereof to draw drafts upon it or upon its correspondents at sight or on time not exceeding one year; to guarantee, for a period not exceeding one year

from the date of such guarantee, the payment by its customers of amounts due or to become due upon the purchase by such customers of real or personal property.

The district court observed that

> [t]he quoted clause on letters of credit was apparently patterned after New York Banking Law § 96(2) (McKinney 1975), from which it differs only in immaterial detail.
>
> No case brought to the attention of the Court construes the relevant portion of either the New York or New Jersey statute or any similar ·piece of legislation. Nor has any legislative history been found.[14]

In addition, the court noted the observations of several legal commentators, but found that the "precise question has apparently not been adequately addressed". 408 F.Supp. at 688 n.5.

We will begin our analysis with an examination of the rationale of the district court opinion, and will then consider the effect of intervening rulings by state judicial and administrative authorities.

We agree that at the time the district court filed its opinion the New Jersey statute at issue here had not been construed under New Jersey law. Since that time, as we have observed (*see* note 13 *supra*), the Superior Court of New Jersey, Appellate Division has discussed this statute in a similar context but in dictum. *New Jersey Bank v. Palladino,* 146 N.J.Super. 6, 368

---

**13.** National Surety also contends that

". . . the Court below erred in holding that a state bank is not estopped from raising as a defense the alleged impropriety of its own actions in issuing a letter of credit automatically renewable from year-to-year," and that "the Court below erred in its *ex parte* solicitation, receipt and reliance upon evidence not contained within the record."

In light of our result, we need not address the estoppel issue. We note, however, that since the district court opinion was filed, the Superior Court of New Jersey, Appellate Division, has held that, in the absence of a showing of justifiable reliance, a bank is not estopped to assert the illegality and invalidity of its guaranty to another bank. *New Jersey Bank v. Palladino,*

146 N.J.Super. 6, 368 A.2d 943 (1976) (construing N.J.S.A. 17:9A–213.1). Because we do not decide this issue, we do not discuss the factor of "reliance" as it may appear in this record.

We make reference to National Surety's "evidence" contention at note 32 *infra*.

**14.** 408 F.Supp. at 687–88 (footnotes omitted). As we find it unnecessary to look to New York law, we express no opinion as to the district court's discussion of New York cases. Nor, for the same reason, need we attach any weight to the opinion of the State of New York Banking Department solicited by counsel for the American Insurance Association (one of the *amici* here). That opinion criticized the holding of the district court.

A.2d 943 (1976). Notwithstanding *Palladino,* there is still no holding by the courts of New Jersey involving the issue presented here under N.J.S.A. 17:9A–25(3). Hence, we start our analysis as if the question were one of first impression. Initially, we will examine the rationale of the district court's opinion before proceeding to a discussion of *Palladino,* recent administrative rulings (as they may affect our conclusion), and the legislation itself.

### A. The District Court's Opinion

The district court began its opinion by examining the statute for clarity and definitiveness. The relevant portion of the statute on which the court focused grants banks the power:

> to issue letters of credit authorizing holders thereof to draw drafts upon it . .
> at sight or on time *not exceeding one year.*

(Emphasis added).

National Surety had urged that the one-year limitation clause (italicized above) modifies the word "time" as a type of draft and not the more remote antecedent term, "letters of credit." It referred the district court to the "last antecedent" rule, which states that

> a limiting clause or phrase modifies the last antecedent unless the subject matter requires a different construction. *U. S. ex rel. Santarelli v. Hughes,* 116 F.2d 613 [, 616] (3d Cir.1940) (footnote omitted).[15]

The district court determined, however, that the "subject matter" of this case indeed required a different construction, and that the last antecedent rule was not applicable.[16] The court thus concluded "that the

controverted statute is not clear on its face, and that it is therefore necessary to look . . . beyond the words of the statute in order to ascertain its meaning." 408 F.Supp. at 689.

Accordingly, the district court's opinion then proceeded to examine the legislative intent underlying the statute. Letters of credit, the district court found, are typically employed in the sale of goods, where the issuing bank's risks are minimal: "not only does the bank engage its credit for a relatively short period of time, but it also acquires a security interest in the goods." 408 F.Supp. at 690.[17] Nonetheless, the district court saw a potential for abuse: because letters of credit create only *contingent* liabilities, banks can overextend themselves.

The district court construed the statute at issue as a response to this potential danger of overextension, declaring that "[t]his case . . . illustrates the need for a statute to limit the power of banks to issue letters of credit," 408 F.Supp. at 690. It continued with the observation that the legislature, in enacting the statute at issue, must have intended precisely the limitation for which the defendant contends, *i.e.,* that letters of credit are limited to a one-year duration.

. To support this conclusion, the district court also noted the role played by New Jersey's Commissioner of Banking in regulating bank practices and in granting powers to banks. The opinion "deems significant" "the interpretation of the state Department of Banking" "that the controverted statute limits the duration of [a letter of] credit." [18]

---

**15.** 408 F.Supp. at 688. This Court's statement of the last antecedent doctrine in *Santarelli* has been cited with approval by other courts. *See, e.g., FTC v. Mandel Bros.,* 359 U.S. 385, 389–90, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975).

**16.** The court also rejected National Surety's claim that New Jersey permits drafts to be drawn upon letters of credit of indeterminate duration so long as the draft itself is drawn within a reasonable time of the letter of credit's issuance. The district court held that New

Jersey statutes overruled this statement of the common law. *See* 408 F.Supp. at 688–89. In light of our disposition, we do not reach this issue. *See* Part IV *infra.*

**17.** A recent opinion of this Court discusses letters of credit generally in a somewhat similar context. *Chase Manhattan Bank v. Equibank,* 550 F.2d 882 (3d Cir.1977).

**18.** *Id.* at 691. The court based its finding on a letter which it *sua sponte* solicited from the Deputy Commissioner of Banking (set out in

Thus the district court's interpretation of N.J.S.A. 17:9A–25(3) rests upon three bases —first, the court's finding that the statute was facially ambiguous, forcing resort to legislative intent; second, the court's interpretation of that intent, and third, the "position" ostensibly taken by New Jersey's Department of Banking.

### B. Subsequent Developments

■ In a diversity case:

The Court of Appeals applies the law as it is at the time the judgment is reviewed, even though the law has been changed since the judgment of the District Court.[19]

The Supreme Court's decision in *Vandenbark v. Owen-Illinois Glass Co.,* 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941) established this rule for diversity cases. The *Vandenbark Court* announced that a change in state law, whether effected by an intervening decision or by a newly enacted statute, may well "cause the reversal of judgments which were correct when entered." 311 U.S. at 543, 61 S.Ct. at 350. Thus, in the present context, where no state interpretation of N.J.S.A. 17:9A–25(3) was to be found at the time that the district court rendered its opinion, we must nevertheless be mindful of state interpretations that have arisen since that time.

And indeed, the interval between the district court's decision in this case and our review of that decision has seen two developments which we must evaluate. On December 13, 1976 the Appellate Division of the Superior Court of New Jersey decided *New Jersey Bank v. Palladino,* 146 N.J.Super. 6, 368 A.2d 943 (1976), in which that court, relying upon the district court's opinion in that case, expressed approval of the

district court's interpretation of N.J.S.A. 17:9A–25(3). Also, on October 1, 1976 the State Department of Banking adopted rules concerning standby letters of credit which appear to be at odds with the letter written by a staff member of the Department of Banking stating that letters of credit are limited to one year. Our discussion as to the effect of these two events follows.

1.

We are not persuaded that the discussion in *Palladino* of N.J.S.A. 17:9A–25(3) affects our conclusion that the district court incorrectly interpreted that statute. Ultimately, of course, we must determine how the New Jersey Supreme Court would decide the question before us.[20] Here, however, New Jersey's highest court has never addressed that question or the authority of state-charter banks to issue letters of credit which exceed one year in duration. Only the *Palladino* decision touches upon this question, and that decision, as we have noted, was rendered by the Superior Court of New Jersey, Appellate Division.

In *Palladino,* plaintiff New Jersey Bank sued First State Bank of Hudson County on Palladino's note, which First State Bank had guaranteed. Plaintiff obtained judgment against First State Bank (and a default judgment against Palladino, the debtor) for the amount of the note, plus counsel fees and interest. By the time the Appellate Division heard the appeal from the trial court judgment, First State Bank had been declared insolvent, and the Federal Deposit Insurance Corporation (FDIC) had succeeded to its interest. The FDIC argued that the letter from the First State Bank's president to plaintiff bank extending the bank's credit [21] was an illegal guaranty, un-

---

relevant part at note 11 *supra* ). *Compare* note 32 *infra.*

**19.** *Branch v. United States Fidelity & Guaranty Co.,* 198 F.2d 1007, 1011 (6th Cir.1952). *Accord, Nelson v. Brunswick Corp.,* 503 F.2d 376, 381–82 & n.12 (9th Cir.1974); *McLarty v. Borough of Ramsey,* 270 F.2d 232, 234 (3d Cir. 1959).

**20.** *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 1A J. Moore, Federal Practice ¶ 0.307[1], at 3301.

**21.** The letter of guaranty read, in pertinent part:

This letter will serve as a commitment to you that the First State Bank of Hudson County will assume the obligation arising from a

der N.J.S.A. 17:9A–213.1. The FDIC's position prevailed, and the judgment against First State Bank was reduced to the amount of benefits it had received.

In attempting to preserve the trial court judgment in its favor, plaintiff bank contended that this letter of guaranty was in fact a letter of credit, and that N.J.S.A. 17:9A–25(3) [22] authorized its issuance. The Appellate Division unequivocally *rejected* plaintiff bank's effort to construe the guaranty letter as a letter of credit: "We hold that [the bank president's] letters were not 'letters of credit' . . . as that term is used in N.J.S.A. 17:9A–25(3)." Thus, by its own explicit holding, the Appellate Division vitiated any need for it to discuss letters of credit or to construe N.J.S.A. 17:9A–25(3). The ensuing discussion, irrelevant to its holding, can only be described as dictum.

That discussion reads:

Moreover, assuming *arguendo* that the letter of October 11, 1972 was a 'letter of credit,' plaintiff's attempt to impose liability on the defendant bank based on the letter fails, as being beyond the express statutory limitation of one year on such undertakings. The default on the Palladino note occurred February 15, 1974, the date plaintiff first demanded payment, i.e., 16 months after the date of Dooley's letter.

Plaintiff argues that since the note was for six months and dated October 12, 1972, the one year period mentioned in the statute did not commence to run until April 12, 1973. We disagree. The plain intent and meaning of the statute is to limit the obligation of a bank on 'letters of credit' to a one-year period from the issuance of the letter. *Cf. National Sure-*

ty Corp. v. Midland Bank & Trust Co., 408 F.Supp. 684, 687–691 (D.N.J.1976). *Palladino, supra,* at 12, 368 A.2d at 946.

By including that discussion in its opinion, however, we are required to determine, under *Erie,* the weight to be afforded a statement of what purports to be the law of New Jersey made by the *intermediate* appellate court of that state when that statement is no more than dictum.

In *Paoletto v. Beech Aircraft Corporation,* 464 F.2d 976 (3d Cir.1972), this Court in a diversity action followed the principle announced in *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) and prescribed the effect of inferior court determinations in ascertaining the state law in question:

We are not precluded from giving 'proper regard' to the holdings of the lower courts of the forum state in fashioning a conflict-of-laws rule, although, unlike the holdings of the state's highest court, they are not necessarily dispositive of the question. See *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1966). [23]

*Paoletto* thus counsels that state intermediate appellate decisions are not automatically controlling. The Supreme Court in *Bosch* summarized current practice in diversity cases as follows:

[E]ven in diversity cases this Court has further held that while the decrees of 'lower state courts' should be 'attributed some weight . . . the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point. *King v. Order of Travelers,* 333 U.S. 153, 160–161, 68 S.Ct. [488], at 492, 92 L.Ed. 608 (1948). And in *West v.*

---

note signed by Mr. Joseph P. Palladino on October 12, 1972 in the amount of $50,000.00.

We will honor this commitment · six (6) months after the date of the note upon notice to us that the loan has not been paid by Mr. Joseph P. Palladino.
*Palladino, supra,* at 10, 368 A.2d at 945.

**22.** N.J.S.A. 17:9A–25(3) is, of course, the very statute which this Court must construe in deciding this appeal. *See* p. 26 *supra.*

**23.** *Id.* at 979.

*A.T.&T. Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940), this Court further held that 'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'* At 237, 61 S.Ct. [179] at 183. (Emphasis supplied.) Thus, under some conditions, federal authority may not be bound even by an intermediate state appellate court ruling. . . .

This is but an application of the rule of *Erie R. Co. v. Tompkins, supra,* where state law as announced by the highest court of the State is to be followed. This is not a diversity case but the same principle may be applied for the same reasons, *viz.,* the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court. *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

*Commissioner v. Estate of Bosch,* 387 U.S. at 465, 87 S.Ct. at 1782.[24]

We conclude, therefore, that while we may not ignore the decision of an intermediate appellate court, we are free to reach a contrary result if, by analyzing "other persuasive data," [25] we predict that the New Jersey Supreme Court would hold otherwise. In short, an intermediate appellate court holding is presumptive evidence, rather than an absolute pronouncement, of state law. Thus we would not be bound to follow the Appellate Division's statement of law in *Palladino* even if that statement represented the Court's holding, which it does not.

As we have noted above, *Palladino's* discussion of the alleged one-year limitation on letters of credit is dictum. Although one commentator has aptly observed that "the obligation to accept local law extends not merely to definitive decisions, but to considered dicta as well," [26] we note that those courts accepting state court dicta have indicated that they do so not in blind adherence to gratuitous discussion in a state court opinion but rather in deference to the persuasiveness of its reasoning.[27] For example, in *Metropolitan Life Insurance Co. v. Chase,* 294 F.2d 500 (3d Cir.1961), this Court found dicta in a New Jersey Appellate Division case to be "adequate evidence" of the state's position on the domicile of the parties to a common-law marriage. This dicta was convincing because it was "in line with" an analogous decision of the New

**24.** *See also* 387 U.S. at 476, 87 S.Ct. at 1788 (Harlan, J., dissenting) ("The Court has . . never held, even in diversity cases, where the federal interest consists at most in affording a 'neutral' forum, that the judgments of state trial courts must in all cases be taken as conclusive statements of state law; apart from a series of cases decided at the 1940 Term, the Court has consistently acknowledged that the character both of the state proceeding and of the state court itself may be relevant in determining a judgment's conclusiveness as a statement of state law").

**25.** *Bosch, supra. Accord, Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 607 (7th Cir.1975); *Klingebiel v. Lockheed Aircraft Corp.,* 494 F.2d 345, 346 n.2 (9th Cir.1974); *Benante v. Allstate Ins. Co.,* 477 F.2d 553, 554 (5th Cir.1973); *Simpson v. Jefferson Standard Life Ins. Co.,* 465 F.2d 1320, 1323 (6th Cir.1972); *Paoletto, supra.*

*See also, Shelp v. National Surety Corp.,* 333 F.2d 431, 439 (5th Cir.1964), *cert. denied,* 379 U.S. 945, 85 S.Ct. 439, 13 L.Ed.2d 543 (1965) ("there is no Erie obligation when there is 'persuasive data that the highest court of the state would decide otherwise' than the intermediate appellate State court.").

**26.** 1A, J. Moore, Federal Practice, ¶ 0.307[2], at 3312.

**27.** *See, e.g., Rocky Mountain Fire & Cas. Co. v. Dairyland Ins. Co.,* 452 F.2d 603, 603–04 (9th Cir.1971) (per curiam) ("considered" dicta); *Hardy Salt Co. v. Southern Pac. Transp. Co.,* 501 F.2d 1156, 1163 (10th Cir.1974) ("considered" dicta to be followed); *Hartford Accident & Indemnity Co. v. First Nat'l Bank & Trust Co.,* 287 F.2d 69, 73 (10th Cir.1961) ("well-considered" dictum).

Jersey Supreme Court. Thus the dicta, given its support in Supreme Court case law, was properly followed.

The difference between the dictum in *Palladino*[28] and the dictum in *Metropolitan Life* is manifest. Unlike the *Metropolitan Life* decision, *supra*, *Palladino's* dictum on letter of credit limitations has no foundation in New Jersey case law. The *Palladino* court's observation was based on its perception of N.J.S.A. 17:9A–25(3) as it was construed not by another state court but by a federal district court in the very decision which we are reviewing here.

*Palladino's* interpretation of this statute, was said to emanate from the statute's "plain intent and meaning."[29] Still, *Palladino* offers no hint as to why the statute must be read to proscribe letters of credit exceeding one year. "Plain intent and meaning" is a standard of statutory construction, yet the decision gives no indication of why the statute, on its face, permits no other interpretation.

Indeed, we note that the *Palladino* opinion fails to even mention a rule adopted by New Jersey's Department of Banking which was issued some months prior to *Palladino*.[30] The new standby rules N.J.A.C. 3:11–9.1 *et seq.*[31] while certainly not dispositive of this appeal suggest a result different from that reflected in the district court's

---

**28.** *See* pp. 29–30 *supra*.

**29.** We cannot help but observe that the federal district court upon whose opinion *Palladino* predicates its interpretation held that the statute is ambiguous, requiring resort "beyond the words of the statute in order to ascertain its meaning." 408 F.Supp. at 689.

**30.** On September 30, 1976, the Department of Banking proposed rules governing standby letters of credit which became effective October 1, 1976. The district court opinion in this case was filed some months before, on February 17, 1976. *Palladino,* as previously noted, was decided on December 13, 1976.

**31.** These rules provide:
Proposed Rules on Standby Letters of Credit
The Department of Banking, pursuant to authority of N.J.S.A. 17:9A–25.2, proposes to adopt new rules concerning standby letters of credit.
Full text of the proposed rules follows: Subchapter 9. Standby Letters of Credit
3:11–9.1 Definitions of standby letters of credit
(a) A "standby letter of credit" is any letter of credit, or similar arrangement however named or described, which represents an obligation to the beneficiary on the part of the issuer: 1. To repay money borrowed by or advanced to or for the account of the account party; or 2. To make payment on account of any indebtedness undertaken by the account party; or 3. To make payment on account of any default by the account party in the performance of an obligation.

.          .          .          .          .          .

3:11–9.3 Authority to issue standby letters of credit
(a) A bank may issue a standby letter of credit on behalf of its customers in the normal course of business: 1. Provided that the bank's undertaking contains a specified expiration date or be for a definite term; and 2. The bank's liability is limited to a stated amount.
3:11–9.4 Parity provision
This Subchapter is directed toward the creation and maintenance of a substantial parity between banks and national banks in accordance with Section 25.2 of the Banking Act of 1948.
Interested persons may present statements or arguments in writing relevant to the proposed action on or before September 29, 1976, to:
Roger F. Wagner
Deputy Commissioner
Department of Banking
Trenton, New Jersey 08625
The Department of Banking, upon its own motion or at the instance of any interested party, may thereafter adopt these rules substantially as proposed without further notice.
Roger F. Wagner
Deputy Commissioner
Department of Banking
Rules on Standby Letters of Credit
On September 30, 1976, Roger F. Wagner, Acting Commissioner of Banking, pursuant to authority of N.J.S.A. 17:9A–25.2 and in accordance with applicable provisions of the Administrative Procedure Act, adopted new rules, to be cited as N.J.A.C. 3:11–9.1 et seq., concerning standby letters of credit, as proposed in the Notice published September 9, 1976, at 8 N.J.R. 411(a).
An order adopting these rules was filed and became effective on October 1, 1976, as R.1976 d. 306.
G. Duncan Fletcher
Director of Administrative Procedure
Department of State

opinion, which gave weight to an "administrative interpretation" of the Department of Banking.[32] N.J.A.C. 3:11–9.3(a) refutes any interpretation that the statute "plainly" bars letters of credit exceeding one year's duration, since it endorses the concept that duration is a matter for agreement by the parties.

■ Turning to the sole judicial precedent relied upon by *Palladino* for its construction of the statute, we observe that the case cited for support is the very one (*National Surety Corp. v. Midland Bank*, 408 F.Supp. 684) which we are here reviewing. While it may well be that the New Jersey Supreme Court could preclude our disagreement with a district court decision in a diversity case by adopting the district court's construction of a state statute, prior to our review of that decision, the New Jersey Supreme Court has yet to speak in support of the district court's interpretation. Under the instant circumstances—(1) where only an intermediate appellate court has discussed the sole issue before us; (2) where even that discussion is dictum; (3) where the only precedent upon which reliance is had is the very case which we are reviewing; (4) where the reasoning in that case is not persuasive; (5) where the interpretation of the statute in both cases is inconsistent with its terms; and (6) where an important intervening administrative development has not been recognized or discussed—we decline to give weight to the *Palladino* decision of the Appellate Division. We are convinced that the New Jersey Supreme Court would decide this issue otherwise. *Bosch, supra,* 387 U.S. at 465, 87 S.Ct. 1776.

### 2.

As discussed above, our analysis must also consider the Department of Banking's recent promulgation of rules governing letters of credit. Notes 30 and 31 *supra*. The New Jersey legislature has delegated substantial authority to the State Commissioner of Banking and Insurance. The Commissioner may regulate the exercise of the statutory powers of banks and prescribe other necessary powers that banks may exercise.[33] A significant factor to be weighed

**32.** The plaintiff contends that the district court erred by unilaterally soliciting after the case had concluded (408 F.Supp. at 691 n.12) and relying upon a Department interpretation of banking practice without affording the plaintiff an opportunity to question the writer of the letter, the practice or custom of the Department, and the interpretation of the Department. We note that the letter upon which the district court relied: (1) was not part of the evidence; (2) therefore is not in the record; (3) in any event was not predicated upon an announced rule of the Department; and (4) is accordingly entitled to little (if any) weight or deference to which a published official ruling might otherwise be entitled. Our disposition of this appeal, however, does not require us to reach or resolve the issue of the alleged impropriety of the district court's reliance on this document. In any event, as a reading of N.J. A.C. 3:11–9.1 *et seq.,* effective October 1, 1976, reveals, the issue of letter of credit time limitations is no longer in doubt.

**33.** N.J.S.A. 17:9A–25.2 provides:

The Commissioner of Banking and Insurance shall have power to make, amend and repeal regulations authorizing banks to make specified kinds of loans or investments not authorized by the act to which this act is a supplement, or not otherwise authorized; except that the commissioner shall not make or continue in force any regulation authorizing banks to make any kind of loan or investment which national banks are not authorized to make. L.1966, c. 279, § 1.

Similarly § 9A–25.3 provides:

In exercising the power conferred upon him by this act, the commissioner shall consider the statutes, regulations and rulings governing the lending and investing powers of national banks, and the regulations made by him shall have as their objective the placing of banks on a substantial competitive parity with national banks, in order that the dual banking system may be preserved. L.1966, c. 279, § 2.

And finally, § 9A–25.5B reads:

B. The commissioner may, by regulation, prescribe the manner in which and the extent to which the foregoing powers may be exercised, and may, by regulation, prescribe other powers, not otherwise expressly authorized or prohibited, which banks may exercise. Regulations so made shall be directed toward creating or maintaining substantial equality between State-regulated and Federally-regulated banks, to the end that no class or group of banks shall have any substantial competitive advantage over another. L.1969, c. 244, § 5, eff. Dec. 23, 1969, supplementing P.L. 1948, c. 67.

by the Commissioner in promulgating rules and regulations governing bank powers is the maintenance of parity between state and national banks. *See* statutes quoted, note 33 *supra; N.J.A.C.* 3:11–9.4, note 31 *supra.* Not surprisingly, then, the newly adopted "Rules on Standby Letters of Credit" set the same limits on letter-of-credit duration that govern national banks. The new rules permit a bank to issue a letter of credit in a stated amount in the normal course of business. The letter of credit must include "a specified expiration date or be for a definite term." [34] It is significant that this rule does not reflect the existence or requirement of any statutory letter of credit time limitation, regardless of whether the "specified expiration date" or "definite term" is for one, five or ten years.

*N.J.A.C.* 3:11–9.3, *see* note 31 *supra,* does more than establish parity between state-charter and national banks with respect to letters of credit. The new rules undercut the district court's interpretation of the statute insofar as its interpretation relied upon the Department's practice. The Department has now issued for the first time an official administrative interpretation concerning letter-of-credit duration. Even if *N.J.A.C.* 3:11–9.3 is not an outright repudiation of the Department's prior practice (as we think it is), the Department's newly adopted regulation severely undercuts the earlier informal observations of its Deputy Commissioner. In so doing, it necessarily undercuts the district court opinion.

Nonetheless, the Department's adoption of *N.J.A.C.* 3:11–9.3 does not resolve our inquiry. Although the new rule may represent a change from the Deputy Commissioner's informal opinion, and the Department's prior practice (if such it was), it clearly does not represent an authoritative construction of the statute in question which alone would require reversal of the district court's decision. Thus, although we believe that the intervening adoption of *N.J.A.C.* 3:11–9.3 has removed a factor

which the district court deemed significant in its analysis of *N.J.S.A.* 17:9A–25(3), we still find it necessary to conduct an independent examination of the statue at issue here and the district court's interpretation of that statute.

### III.

As we previously stated, the district court's construction of *N.J.S.A.* 17:9A–25(3) rests on three bases—first, its determination of ambiguity, which mandated resort to legislative intent; second, the district court's reading of that intent; and third, the "significant" opinion of the state Deputy Commissioner of Banking.

In light of our preceding discussion concerning *N.J.A.C.* 3:11–9.3, this third factor need not detain us. The Department of Banking's new rules drain the Deputy Commissioner's opinion of whatever significance it may have made. *See* note 32 and Part II.B.2 *supra.*

The district court's determination that the statute is ambiguous is similarly suspect. In its opinion the district court adverted to this Court's long-standing reliance on the "last antecedent" rule. 408 F.Supp. at 688. More to the point in this diversity context is the New Jersey courts' consistent application of this rule of construction. *New Jersey Insurance Underwriting Association v. Clifford,* 112 N.J.Super. 195, 270 A.2d 723, 727–28 (1970); *State v. Wean,* 86 N.J.Super. 283, 206 A.2d 765, 768 (1965).

In *Clifford,* for example, the Appellate Division construed a definitional section of the banking statute, *N.J.S.A.* 17:37A–2(a). That section reads:

> (a) "Essential property insurance" means insurance against direct loss to property as defined and limited in the standard fire policy and extended coverage endorsement thereon, as approved by the commissioner, and insurance for such types, classes, and locations of property

---

**34.** *N.J.A.C.* 3:11–9.3. The Comptroller of the Currency has issued regulations governing the issuance of letters of credit by *national* banks which set the following limit of duration:

(2) The bank's undertaking must contain a specified expiration date or be for a definite term.
12 C.F.R. § 7.7016.

against the perils of vandalism, malicious mischief, burglary, or theft, or such other classes of insurance as the commissioner may designate *in order to comply with Federal legislation and obtain Federal reinsurance* ;

(Emphasis supplied). The appellant there contended that the italicized language modified "vandalism, malicious mischief, burglary or theft". The court rejected this construction, finding that the qualifying language applied only to commissioner-designated "other classes of insurance." In so holding, the court said:

> The difficulty with this contention is that the clause of which the cited qualifying words are a part is set off by itself from the remainder of the paragraph. We are satisfied that the cited phrase was intended to refer to its last antecedent, 'such other classes of insurance as the commissioner may designate.' See 82 C.J.S. Statutes § 334 at 670 (1953); *cf. State v. Wean, supra,* 86 N.J.Super. at 288, 206 A.2d 765. Had the modifying phrase been intended to relate to more than its last antecedent, a comma could have been used to set off the modifier from the entire series. *T. I. McCormack Trucking Co. v. United States,* 298 F.Supp. 39, 41 (D.C.N.J.1969).

112 N.J.Super. at 204, 270 A.2d at 727–28.

■ Applied to the statute before us, this rule requires rejection of the district court's finding of ambiguity. N.J.S.A. 17:9A–25(3) gives banks the power

> to issue letters of credit authorizing holders thereof to draw drafts upon it or upon its correspondents at sight or on time *not exceeding one year* . . . .

Common English usage, let alone the last antecedent rule of statutory construction, requires that the italicized language be read to modify "time", rather than the more remote phrase "letters of credit".

Indeed, as appellant argues here and contended below, the legislature, with the simple addition of a comma after "time", could have opted for a time limit restricting the duration of both drafts and letters of credit. Had that option been elected, New Jersey courts undoubtedly would have construed the statute as did the district court, and we would have followed suit. *See Gudgeon v. County of Ocean,* 135 N.J.Super. 13, 17, 342 A.2d 553, 555–56 (1973) ("Where a comma is used to set a modifying phrase off from previous phrases, the modifying phrase applies to all the previous phrases, not just the immediately preceding phrase.") *See also T. I. McCormack Trucking Co. v. United States,* 298 F.Supp. 39, 41 (D.N.J.1970) (three-judge court), *cited in Clifford, supra.*

Here, however, the language of the statute leaves no doubt that the legislature opted for a one-year time limit applicable only to *drafts* drawn on letters of credit, and not to the letters of credit themselves. Such is the plain meaning of the statute.

Even if we were to concede that the legislative draftsmen were guilty of grammatical inexactitude in drafting N.J.S.A. 17:9A–25(3)—which we do not—we are not persuaded that their intent was to place New Jersey state-charter banks at a competitive disadvantage vis-a-vis national banks.

The district court speculated that the legislature's foremost considerations were in the areas of fulfilling commercial needs and serving the significant public interest by a stable banking system. 408 F.Supp. at 690. From this, the court concluded that the legislature must have intended to keep state banks on a short rein by restricting open-ended contingent extensions of credit.

But we need not rely upon the district court's view of legislative intent, where the legislature itself has given expression to that intent. Without denigrating the concededly important considerations which guided the district court's discussion, we believe that the overriding intent of the legislature was the creation and maintenance of parity between state-charter and national banks. In three separate provisions—N.J.S.A. 17:9A–25.2; 9A–25.3; and 9A–25.5B [35]—the legislature has manifested

35. These provisions are set out in note 33 *supra.*

its concern that state banks be permitted to compete with national banks under materially similar rules. Indeed, the legislature in N.J.S.A. 17:9A–25.3 granted the State Commissioner of Banking broad regulatory and interpretive powers, thereby enabling him to achieve this objective of keeping state banks competitive. In light of the very considerable discretionary powers held by the Commissioner and the legislature's expressed intent that state banks achieve and maintain parity with national banks, we are satisfied that the district court erred in its interpretation of N.J.S.A. 17:9A–25(3).

Having examined and rejected the three bases for the district court's construction of Section 9A–25(3), we conclude that the district court's construction cannot be sustained. We hold that the New Jersey Supreme Court, if confronted with an issue similar to the question before us, would interpret as do we the relevant provision of N.J.S.A. 17:9A–25(3) so as to limit to a one year duration only drafts drawn upon letters of credit, and further, that the statute does not provide or require any restriction on letter-of-credit duration.

## IV.

■ Our determination that New Jersey by statute has not restricted the duration of letters of credit issued by its banks to a one-year period resolves the issue framed by the parties. We recognize that in attempting to have this issue determined in its favor, the plaintiff contended that New Jersey common law would hold as valid a draft under a letter of credit if drawn within a reasonable time from issuance of the letter of credit. We need not resolve the issue of New Jersey's common law rule for two reasons. First, we have held that N.J.S.A. 17:9A–25(3) imposes no time restriction on letters of credit. Second, on this record, even if the common law rule advocated by plaintiff was determinative, the findings made by the district court would dispose of that issue in plaintiff's favor. The district court found (Findings of Fact nos. 9, 23 and 27) that both of National Surety's drafts were presented within a reasonable period from the issuance of the respective letters of credit. No one attacks these findings as clearly erroneous. *See Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir.1972). Hence they are binding upon us.

## V.

Having concluded that the letters of credit are valid, we will reverse the March 23, 1976 order of the district court and will direct that judgment be entered in favor of National Surety and against Midland Bank.